1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GEARSOURCE HOLDINGS, LLC,

                    Plaintiff,

          v.

GOOGLE LLC,

                    Defendant.

Case No.  18-cv-03812-HSG

**ORDER GRANTING SUMMARY JUDGMENT, DENYING IN PART AND REFERRING IN PART MOTION FOR SANCTIONS, AND GRANTING IN PART AND DENYING IN PART MOTIONS TO SEAL**

Re: Dkt. Nos. 126, 128, 153, 156

Pending before the Court is Defendant Google LLC's ("Google") Motion for Summary Judgment.  Dkt. Nos. 153 ("Mot."), 155 ("Opp."), and 158 ("Reply").  Google has also filed a motion for discovery sanctions ("Motion for Sanctions"), Dkt. No. 128, and the parties have filed administrative motions to seal portions of their briefs and exhibits related to both the Motion for Summary Judgment and the Motion for Sanctions ("Motions to Seal").  *See* Dkt. Nos. 126, 156. On May 7, 2020, the Court held a hearing on the various motions.  Dkt. No. 161.  For the reasons below, the Court **GRANTS** Defendant's Motion for Summary Judgment, **DENIES IN PART AND REFERS IN PART** the Motion for Sanctions, and **GRANTS IN PART** and **DENIES IN PART** and the Motions to Seal.

I.      **BACKGROUND**

On September 29, 2016, Google rebranded its suite of productivity and collaboration software under the new brand "G SUITE."  *See* Dkt. No. 153-1, Declaration of Jane van Benten ("JvB Decl.") Ex. 22 at No. 6.  Composed of individual applications known as Gmail, Docs, Drive, Calendar, and Hangouts, G SUITE combines email, calendaring, document creation, file sharing, videoconferencing, and chat tools, for which businesses pay a monthly subscription.  *Id.*

United States District Court
Northern District of California

1  Ex. 28 (Dep. of Jeremiah Dillon) at 46:3-9, 47:21-23, 58:16-59:14, 62:15-19, 109:17-110:1.  It is

2  undisputed that Google has used the G SUITE mark in commerce to identify this suite of software

3  since September 29, 2016.  *See* Dkt. No. 126-26.

4         Previously, on June 9, 2016, Google applied to register the G SUITE mark in Tonga, a

5  foreign jurisdiction.  JvB Decl. Ex. 34.  On November 28, 2016, Google filed a corresponding

6  trademark application for G SUITE in the United States (Serial No. 87/249,405) (the "'405

7  Application").  *See id.* Ex. 36.  The U.S. Patent and Trademark Office ("PTO") subsequently

8  entered Google's claim of foreign priority under Section 44(d) of the Lanham Act, which confers a

9  priority date corresponding to the filing date of the earlier-filed foreign application.  *See id*. Exs.

10  46, 48; *see also* 15 U.S.C. § 1126(d).

11         Plaintiff GearSource, founded by owner and CEO Marcel Fairbairn in 2002, is an online

12  service for buying and selling used theater gear.  *See* Dkt No. 1 ("Compl.") ¶ 9.  People or

13  companies with theater gear to sell create a listing, which is then routed to Plaintiff's system

14  where Plaintiff reviews it, calculates shipping, receives a portion of the proceeds, and then

15  publishes it on GearSource.com to be viewed by potential buyers.  *See* JvB Decl. Ex. 31 (Dep. of

16  Claudette Cyr ("Cyr Depo.")) at 13:12-24, 15:7-17, 20:1-5, 21:3-24.  Plaintiff also facilitates the

17  payment, acting as a retailer and informal escrow account.  *Id*. at 13:23-14:3, 21:25-22:7.

18         Plaintiff initially used NetSuite commercial software.  *Id*. at 25:17-24.  In 2016, Mr.

19  Fairbairn decided that Plaintiff should develop its own software to replace NetSuite.  *Id*. at 26:2-7;

20  JvB Decl. Ex. 26 (May 16, 2019 Dep. of Marcel Fairbairn ("Fairbairn Depo.")) at 145:4-146:9,

21  359:1-8.  On June 30, 2016, Mr. Fairbairn proposed the name "G-SUITE," and the alternative

22  name "GSiQ," for the planned NetSuite-replacement.  *See* Dkt No. 139-7 (message from Mr.

23  Fairbairn to Ms. Cyr on June 30, 2016 stating "[l]et's officially call this 'G-Suite' … I like it … **I**

24  **also like GSiQ – I pitched them both on the call this morning**.") (ellipsis in original) (emphasis

25  added).

26         The factual dispute between the parties is when Plaintiff began to display its G-SUITE

27  mark on its downloadable mobile app (the "App").  Plaintiff contends that the App contained and

28  displayed the G-SUITE mark prior to Google's Tongan application date of June 9, 2016.  This use,

according to Plaintiff, began somewhere around May or June 2016—prior to the June 30, 2016 date on which Mr. Fairbairn proposed the name G-SUITE (and also "pitched" GSiQ as a potential name) for the planned NetSuite-replacement.  Opp. at 20.  Google contends that the App displayed the G-SUITE mark starting in June of 2018.  *See* JvB Decl. Ex. 29 (Dep. of Tom de Manincor ("de Manincor Depo.")) at 183:9-13; JvB Decl. Ex. 50 (Expert Report of Dr. David Cummings ("Cummings Report")) ¶ 104.  This is because at least two of Plaintiff's employees separately circulated screenshots of the App in 2017 that did not reflect the use of the G-SUITE mark, and the underlying metadata of screenshots provided by Plaintiff shows that the App was updated in 2018 to display the G-SUITE mark.  Dkt. Nos. 126-25; 139-12; *see also* Dkt. Nos. 61-5 (Ms. Cyr noting on April 22, 2018 that "This is REALLy [sic] important!  By making the App part of G-Suite®, we are covering ourselves completely on the Google lawsuit simply because the app is downloadable."); 126-12 (message from Cyr to de Manincor on June 1, 2018 asking "how hard is it to change the logos on the app" and noting that "I think we need to – it supports the lawsuit situation and that could be big").

Once updated, Plaintiff uploaded the new version of the App, whose homepage now featured the tagline "Powered by G-Suite," to Apple's and Google's app stores on June 14 and June 15, 2018, respectively.  *See* Cummings Report ¶¶ 67, 104 (G-SUITE added to App code June 14, 2018).  The first component of Plaintiff's G-SUITE—separate and apart from the App—also "officially launched" on April 1, 2017, well after the 2016 date claimed by Plaintiffs with respect to the App.  *See* JvB Decl. Exs. 11, 12.

On August 9, 2016, Plaintiff filed a U.S. application for the G-SUITE mark.  Dkt. No. 128-11.  After an amendment, the application covered "Computer software for use in creating searchable databases of information and data for use in the buying and selling of lighting, audio and visual equipment, staging, trussing and rigging equipment, musical instruments, for others," with the software further specified as a good in Class 9, rather than as a service in one of the service classes.  *See* JvB Decl. Exs. 4; 25 (Dep. of Shampa Reddy ("Reddy")) at 52:5-12, 68:2-17.  The basis for Plaintiff's application was Section 1(b) of the Lanham Act, which allows an application to be filed based on an intent to use the mark (an "ITU application"), but permits

United States District Court
Northern District of California

1   registration of a mark only after the applicant commences its use of the mark in commerce for the

2   applied-for goods.  *See* JvB Decl. Ex. 43; 15 U.S.C. § 1051(b)-(d).  On September 29, 2016, about

3   six weeks after filing the application, Plaintiff, a user of Google's productivity apps, received

4   Google's email announcing its new G SUITE brand.  *See* Dkt. No. 126-26.

5         On March 8, 2017, the PTO issued an initial office action against Google's '405

6   Application, citing a potential likelihood of confusion with Plaintiff's applied-for G-SUITE mark.

7   *See* JvB Decl. Ex. 37.  Plaintiff's application moved through the PTO's internal review process

8   until June of 2017, when the PTO announced it would be published for opposition.  *See id.* Ex. 44.

9         On June 13, 2017, Plaintiff's attorney, Shampa Reddy, asked Plaintiff for a sample of use

10   in commerce.  *See id.* Ex. 6; Cyr Depo. at 71:21-72:16; Reddy Depo. at 59:14-18.  G-SUITE had

11   not yet been sold or transported to any customer at that time.  *See* de Manincor Depo. at 19:20-22.

12   Ms. Cyr nonetheless asked Plaintiff's software programmer, Mr. de Manincor, to help her create

13   specimens of use to submit to the PTO.  *See* Dkt. No. 126-13 ("I need you to do something for me

14   ASAP...On G-Suite - the log-in and logged in pages, we need to show the name G-Suite - I have to

15   show 'specimens of use in Commerce.'").  On June 19, 2017, the G-SUITE mark appeared for the

16   first time on a customer-facing portion of Plaintiff's website, www.gearsource.com.  *See*

17   Cummings Report ¶ 67 (Table Row 4), ¶ 104.  This consisted of a link titled "G-SUITE" in the

18   footer of the website, which only led to information about the upcoming G-SUITE software.  *Id.*;

19   JvB Decl. Ex. 27 (Dep. of Rebecca Jennings ("Jennings Depo.")) at 25:20-26:5; Fairbairn Depo. at

20   116:20-117:2.

21         On August 29, 2017, Mr. de Manincor inserted the word "G-SUITE" into the internal order

22   review screen on Plaintiff's website, and Ms. Cyr provided a screenshot to Ms. Reddy for the

23   PTO.  Dkt. Nos. 126-13; 128-10; de Manincor Depo. at 197:20-199:16; Reddy Depo. at 80:4-8;

24   Cyr Depo. at 61:24-25, 63:16-25, 65:9-22.  The PTO issued the Notice of Allowance in October

25   2017, starting the time period during which Plaintiff could submit its sample and sworn

26   declaration that it had started using the mark to identify the applied-for goods in commerce,

27   known as a Statement of Use ("SOU").  *See* JvB Decl., Ex. 45.  Ms. Reddy then filed the sample

28   reflecting the internal order review page along with the SOU.  Dkt. No. 128-10.  Plaintiff did not

1 | provide evidence in the SOU regarding the G-SUITE mark that it now alleges was in the App as

2 | of May or June 2016 in the SOU.

3 |       Plaintiff's trademark registration issued in January of 2018.  *See* Dkt. No. 128-3.  Plaintiff

4 | filed suit on June 26, 2018.  Google counterclaimed for cancellation of Plaintiff's G-SUITE

5 | registration.  Dkt. No. 26.  Discovery disputes ensued, Dkt. No. 127-1 at 9-21, and on January 24,

6 | 2020, Google filed the Motion for Sanctions.

7 | **II.      LEGAL STANDARD**

8 |       Summary judgment is proper when a "movant shows that there is no genuine dispute as to

9 | any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

10 | A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*

11 | *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is evidence in the

12 | record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.*  The

13 | Court views the inferences reasonably drawn from the materials in the record in the light most

14 | favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

15 | 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations,"

16 | *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v.*

17 | *Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

18 |       The moving party bears both the ultimate burden of persuasion and the initial burden of

19 | producing those portions of the pleadings, discovery, and affidavits that show the absence of a

20 | genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the

21 | moving party will not bear the burden of proof on an issue at trial, it "must either produce

22 | evidence negating an essential element of the nonmoving party's claim or defense or show that the

23 | nonmoving party does not have enough evidence of an essential element to carry its ultimate

24 | burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102

25 | (9th Cir. 2000).  Where the moving party will bear the burden of proof on an issue at trial, it must

26 | also show that no reasonable trier of fact could not find in its favor.  *Celotex Corp.*, 477 U.S. at

27 | 325.  In either case, the movant "may not require the nonmoving party to produce evidence

28 | supporting its claim or defense simply by saying that the nonmoving party has no such evidence."

United States District Court
Northern District of California

United States District Court
Northern District of California

1  *Nissan Fire*, 210 F.3d at 1105.  "If a moving party fails to carry its initial burden of production,

2  the nonmoving party has no obligation to produce anything, even if the nonmoving party would

3  have the ultimate burden of persuasion at trial."  *Id.* at 1102–03.

4  　　　"If, however, a moving party carries its burden of production, the nonmoving party must

5  produce evidence to support its claim or defense."  *Id.* at 1103.  The nonmoving party "must do

6  more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*

7  *Elec. Indus. Co.*, 475 U.S. at 586.  A nonmoving party must also "identify with reasonable

8  particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91 F.3d 1275,

9  1279 (9th Cir. 1996).  If a nonmoving party fails to produce evidence that supports its claim or

10  defense, courts enter summary judgment in favor of the movant.  *Celotex Corp.*, 477 U.S. at 323.

11  　　　"To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C.

12  § 1114, a party 'must prove: (1) that it has a protectible ownership interest in the mark; and (2)

13  that the defendant's use of the mark is likely to cause consumer confusion.'"  *Network*

14  *Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (quoting

15  *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)).  As

16  Plaintiff correctly notes, it is a "well-established principle that because of the intensely factual

17  nature of trademark disputes, summary judgment is generally disfavored in the trademark arena."

18  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th

19  Cir. 2010) (quotations and alterations omitted).

20  **III.**　　　**DISCUSSION**

21  　　　Google contends that it—not Plaintiff—has priority based on both the earlier-filed Tongan

22  trademark application date and earlier actual use in commerce.  Google also argues that Plaintiff's

23  registration is void because Plaintiff failed to satisfy the mandatory prerequisites for valid

24  registration.  Lastly, Google contends that Plaintiff's claim to have used the G-SUITE mark on the

25  App prior to June 9, 2016 is demonstrably false, and that there is no genuine dispute of material

26  fact as to first use in commerce.

27  　　**A.**　　　**Trademark Infringement Claim**

28  　　　A plaintiff alleging trademark infringement under the Lanham Act "must prove: (1) that it

has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202-03 (9th Cir. 2012) (quotation omitted). "An ownership interest in a mark is demonstrated through priority of use." *Am. Auto. Ass'n of N. Cal., Nev. & Utah v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1088 (N.D. Cal. 2019). These two elements—priority of use and likelihood of confusion—are the same whether the claim is for infringement of a registered mark under 15 U.S.C. § 1114(1) or infringement of common law trademark rights (also called unfair competition or false designation of origin) under 15 U.S.C. § 1125(a)(1)(A*). See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 n.6 (9th Cir. 1999). In addition, unfair competition actions under California Business and Professions Code § 17200 ("UCL") are "substantially congruent" to Lanham Act claims. *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) (quotation omitted).

### i. Priority Rights

"Under the principle of first in time equals first in right, priority ordinarily comes with earlier use of a mark in commerce." *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1093 (9th Cir. 2004). Registration of the mark "constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark on the goods and services specified in the registration." *Brookfield*, 174 F.3d at 1047. The Lanham Act creates a limited exception to the use-based priority rule, providing for a mark that is subject to a federal trademark application under Section 1(b) or Section 44 of the Act to obtain a "constructive use" date that may be earlier than the actual first use date. 15 U.S.C. § 1057(c). "'Constructive use' means that which establishes a priority date with the same legal effect as the earliest actual use of a trademark at common law." 2 J. Thomas McCarthy on Trademarks and Unfair Competition ("McCarthy") § 16:17 (5th ed.).

Plaintiff contends that its registration is dispositive of priority rights. Opp. at 4. However, registration is prima facie evidence of priority dating only back as early as the filing date, and only in connection with the goods and services registered. *See* 15 U.S.C. § 1057(c); *Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 970 (9th Cir. 2007). Therefore, to establish priority, Plaintiff

1    must establish a date of first use—whether constructive or actual—that is before any date of first

2    use by Google.

3                    a.    Plaintiff's Constructive Use Date is Later than Google's

4              An ITU application has a constructive first use date corresponding to the filing date of that

5    application.  15 U.S.C. § 1057(c).  Contingent upon the application maturing to registration, an

6    owner can assert nationwide priority over all others dating back to that filing date—**except** persons

7    who have earlier actual or constructive use dates than the registration owner.  *Id*. (emphasis

8    added).  Such exceptions include any person who, as of the plaintiff's constructive use date, "has

9    filed a foreign application to register the mark on the basis of which he or she has acquired a right

10   of priority, and timely files an application under section [44](d)...to register the mark which is

11   pending or has resulted in registration of the mark."  15 U.S.C. § 1057(c)(3).

12             An application with Section 44(d) priority, such as Google's, has a constructive use date

13   corresponding to the filing date of the foreign application (the "Foreign Priority Filing Date").  15

14   U.S.C. § 1126(d).  Plaintiff contends that 15 U.S.C. §1126(d)(2) requires that a foreign application

15   must conform "as nearly as practicable to the requirements of [the Lanham Act], including a

16   statement that the applicant has a bona fide intention to use the mark in commerce."  Opp. at 4.

17   Google's Tongan application, according to Plaintiff, contains no such statement.  *Id*. (citing JvB

18   Decl. Ex. 34).  And according to Plaintiff, there is no indication that the PTO accepted the Tongan

19   registration as the valid constructive use date for Google's application.  Opp. at 4 (citing JvB Decl.

20   Exs. 46, 48).

21             Section 1126(d)(2) does not incorporate the requirement Plaintiff asserts.  Plaintiff's

22   reading that Section 1126(d)(2) requires a certain or definite statement in the foreign application is

23   unsupported by the plain text of the Lanham Act.  That requirement in Section 1126(d)(2) applies

24   only to the corresponding U.S. application, as that statutory section clearly specifies whenever it

25   refers to the foreign application, and does not impose any such requirement in the provision

26   Plaintiff cites.  *Compare* 15 U.S.C. § 1126(d) (specifying "the foreign application" or "the first

27   application in the foreign country") with *id*. § 1126(d)(2) ("the application").  The Trademark

28   Manual of Examining Procedure ("TMEP") further supports this, explaining that the required

United States District Court
Northern District of California

statement must be included in the "application filed under §[1126](d) on either the Principal or the Supplemental Register."  TMEP § 1008; *see id.* § 801.02 (defining "Principal Register" and "Supplemental Register" as the U.S. Registers created by the Trademark Act of 1946).

Further supporting this reading of the statute, once the PTO finds that an applicant has not met the requirements for foreign filing priority under § 1126(d), "the [PTO] examining attorney must advise the applicant that it is not entitled to priority."  TMEP § 1002.02.2.  If the requirements are met, however, the claim of priority will appear in the application file in the PTO's online trademark database.  TMEP § 1003.01 ("If the applicant is not entitled to [§ 1126(d)] priority as to any goods/services, the examining attorney must ensure that the priority claim is deleted from the Trademark database.").  Here, the PTO entered the June 9, 2016 priority date in its trademark database for Google's '405 Application.  *See* JvB Decl. Ex. 54; Dkt. No. 153-49.  And the PTO undisputedly never advised Google that it was not entitled to priority, nor deleted the claim.  JvB Decl. ¶ 6.  Therefore, the Court finds that the foreign filing date is the appropriate one to use in determining constructive use priority.

Once Plaintiff's unpersuasive Section 1126 conformation argument is disposed of, there does not appear to be any genuine dispute between the parties that Google's Foreign Priority Filing Date is June 9, 2016, while Plaintiff's constructive use date is later—August 9, 2016 (the date of its U.S. application for the G-SUITE mark).  Opp. at 4; Dkt. No. 128-11.  Therefore, in a contest of priority with an applicant who has an earlier constructive use date, Plaintiff must then prove its prior rights "under the traditional rules of common law trademark priority."  McCarthy § 16:17 (5th ed.); *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 986 F. Supp. 253, 258-60 (D. Del. 1997), *aff'd*, 186 F.3d 311 (3d Cir. 1999).  Plaintiff must raise a genuine issue of material fact as to whether its first use date was before June 9, 2016 to survive Google's Motion for Summary Judgment.

b.  Plaintiff's Constructive Use Date Applies to Non-Relevant Goods

Additionally, Plaintiff cannot rely on its registration to establish prior rights because the registration covers goods that do not parallel the rights Plaintiff alleges were infringed.  The benefits of registration, including the constructive use date, apply only to the specific goods or

United States District Court
Northern District of California

9

services identified in the registration.  15 U.S.C. § 1057(c); *Applied Info*, 511 F.3d at 970.

Plaintiff contends that in *Applied Info*, the Ninth Circuit held that the scope of remedies for infringement was wider than the language in the registration at issue there.  Put differently, when a plaintiff has established a valid registration for goods and services identified in the registration, "the scope of relief will extend beyond those goods or services to an infringing mark used on any goods or services where confusion is likely to result"  *Applied Info*, 511 F.3d at 971 (citation omitted).  Therefore, according to Plaintiff, "the owner does not additionally have to show that the defendant's allegedly confusing use involves the same goods or services listed in the registration."  *Id*. at 972.  Based on this reasoning, Plaintiff contends that it does not have to prove a common law right to the G-SUITE mark.

However, Plaintiff misconstrues the standard.  The issue is not whether Plaintiff must establish a protectable interest by showing that Defendant's use involves the same goods: rather, the use must *relate* to the specific goods or services identified in the registration.  Here, Plaintiff's registration covers a narrow subset of theater-based goods ("Computer software for use in creating searchable databases of information and data for use in the buying and selling of **lighting, audio and visual equipment, staging, trussing and rigging equipment, musical instruments**, for others," Compl. ¶ 10 (emphasis added)), while it alleges infringement of entirely different services altogether (namely "a fully-integrated, online business solution providing order and payment processing, a shipping component, and an API to connect to any external accounting system").  *Id*. As the latter rights are clearly unregistered, Plaintiff must prove them under common law principles for this additional and independent reason.[1]

### ii.   Plaintiff Has No Common Law Rights Prior to Google

#### a.   Plaintiff's Actual Use as of September 29, 2016 Other Than the App

"Under the Lanham Act and Ninth Circuit law, 'actual' trademark use occurs through 'use

---

[1] For example, in *Levi Strauss & Co. v. Blue Bell, Inc.*, plaintiff owned a registration for a design covering pocket tabs on pants, but it alleged infringement of its trademark rights in the design for pocket tabs on clothing generally.  778 F.2d 1352, 1354 (9th Cir. 1985).  The Ninth Circuit explained that plaintiff could not "extend its own use of its registered mark to goods not specified in its federal registration[,]" meaning that for clothing other than pants, it had to prove its rights. *Applied Info Scis.*, 511 F.3d at 972 (summarizing *Levi Strauss*, 778 F.2d at 1359).

in commerce,' which means 'the bona fide use of a mark in the ordinary course of trade, and not [use] merely to reserve a right in a mark.'" *Am. Auto.*, 367 F. Supp. 3d at 1089 (quoting *Brookfield*, 174 F.3d at 1051). Such use also requires that the goods identified by the trademark must actually be sold or transported in commerce, and for services, it means that services identified by the mark must be both advertised and rendered in commerce. 15 U.S.C. § 1127. The display of a mark in promotional materials is insufficient for trademark rights to attach. *Rearden*, 683 F.3d at 1204 (explaining that the "dual requirement" that services be both advertised and rendered in commerce means that "mere advertising by itself may not establish priority of use." (quotation omitted)). Thus, use of a mark in, for example, emails to potential customers or in business proposals is insufficient. *Brookfield*, 174 F.3d at 1052 ("mere use in limited e-mail correspondence with lawyers and a few customers" was not use in commerce); *Am. Auto*, 367 F. Supp. 3d at 1095 (emails "are private one-on-one communications with individuals, not public use of the mark"). Likewise, internal use, or preparations to use a mark on as-yet-nonexistent products, cannot create trademark rights as a matter of law. *Rearden*, 683 F.3d at 1206-07 (internal use among related companies is not trademark use); *Brookfield*, 174 F.3d at 1052 ("[T]rademark rights are not conveyed through...mere preparation to use a term as a trademark…").

As the Ninth Circuit has explained: "The purpose of a trademark is to help consumers identify the source, but a mark cannot serve a source-identifying function if the public has never seen the mark and thus is not meritorious of trademark protection until it is used in public in a manner that creates an association among consumers between the mark and the mark's owner." *Brookfield*, 174 F.3d at 1051.

Other than the App, it is undisputed that any display of the G-SUITE mark in 2016 was limited solely to internal documents and a couple of emails to outsiders. JvB Decl. Ex. 19 at No. 6; *id.* Exs. 11, 13, 14 at 527 (describing G-SUITE as an "internal tool" that "requires a 'staff' identifier to be able to access."), *id.* Ex. 5 at 49-50 ("g suite isnt public or crawlable...only staff would see i[t]"). *See also* Dkt. No. 172 (May 7, 2020 Hr'g Tr.) at 9:25-10:5 ("The Court: Is it correct that the basis for your argument that there is a dispute of material fact on this question of

United States District Court
Northern District of California

1   use, your client's use is limited to the App as opposed to anything else?  Mr. Freeman: Yeah, that

2   is correct in terms of it appearing in May of 2016."); Opp. at 7 (no 2016 use mentioned other than

3   the App).

4      Plaintiff's use prior to September 29, 2016 consisted of (mostly) internal references to the

5   mark during preparations to develop an alternative to NetSuite, with the exception of an email sent

6   on July 12, 2016 to a potential acquirer mentioning such plans.  *See* JvB Decl. Exs. 7 at 498, Ex. 8,

7   Ex. 9 ("Expected to launch in 2017, GS-3.0 and it's unique toolbox, G-SUITE®, will raise the bar

8   on the used item businesses[.]"); *id.* Ex. 10; *see also* Cummings Report ¶ 104 (the G-SUITE mark

9   did not appear on Plaintiff's website until 2017); de Manincor Depo. at 165:2-6 (same).  The

10  Court finds that such use falls short of any activity that might establish common law rights before

11  Google's trademark rights attached, with the consequence that to establish common law priority

12  rights, Plaintiff must establish a genuine issue of material fact as to whether the App was used in

13  commerce prior to June 9, 2016.

14        b. Plaintiff's Use of the App Prior to June 9, 2016

15     Although Plaintiff contends that there is a genuine dispute of material fact as to whether

16  the App displayed the mark prior to June 9, 2016, the Court disagrees.  Taking all reasonable

17  inferences in Plaintiff's favor, all of the evidence, including screenshots of the App circulated by

18  Plaintiff's COO and other employees in 2017, shows that the App first displayed the G-SUITE

19  mark on a date *after* June 9, 2016—with the uncorroborated (and recanted and revised) testimony

20  of Plaintiff's CEO being the sole and isolated exception.

21     A close review of the evidence and Plaintiff's shifting positions throughout the case is

22  necessary.  Plaintiff's initial theory was that a screenshot of the App—produced by Plaintiff in

23  PDF format without metadata—showed the use of the G-SUITE mark on the App as of May 2016.

24  Opp. at 5 (citing Dkt. No. 128-15 (Ex. 33 to Fairbairn Depo)).  Yet, Plaintiff's CEO undisputedly

25  proposed the G-SUITE mark on or around June 30, 2016, which necessarily implies that the mark

26  was not included in any update before June 9, 2016, let alone in May 2016.  *See* Dkt No. 139-7

27  (message from Fairbairn to Cyr on June 30, 2016 stating "[l]et's officially call this 'G-Suite' … I

28  like it … **I also like GSiQ – I pitched them both on the call this morning**.") (ellipsis in original)

1    (emphasis added).  Plaintiff cannot show that the G-SUITE mark was added to the App prior to

2    June 9, 2016, when the G-SUITE mark was not even proposed—along with "GSiQ"—until three

3    weeks later.[2]

4            That Plaintiff's G-SUITE mark was not added to the App prior to June 9, 2016 is also

5    corroborated by the undisputed evidence of (1) screenshots of the App circulated by Plaintiff's

6    employees prior to the June 2018 update which showed no use or instance of the G-SUITE mark,

7    Dkt. Nos. 126-25; 139-12; (2) Plaintiff's internal communications that it set about "making the

8    App part of G-SUITE®" after it received Google's letter questioning its failure to use the mark for

9    downloadable software, Dkt. Nos. 61-5; 126-12; 126-28; and (3) Plaintiff's former employees

10   testifying that G-SUITE had not previously been part of the App.  *See* de Manincor Depo. at

11   183:9-13 ("Q: And does that still mean that the earliest possible instance of the G-Suite mark on

12   the GearSource mobile application for the US is June 4th, 2018?  A: Based on this data, yes, it

13   does."); Jennings Depo. at 49:10-13 ("Q: Do you remember at any point the G-SUITE mark going

14   into the app?  A. I never was aware of it going into the app."); JvB Decl. Ex. 24 (Deposition of

15   Leonard Brooks "Brooks Depo.")) 57:5-59:15 ("I'm surprised that it's the G Suite app now.  It was

16   not in the plan.  I never heard anything about it.").

17           On May 17, 2017, Carrier Bourgette, an employee of Plaintiff, circulated screenshots of

18   the App in an email aptly titled "App screen shots," in which it is undisputed that none of the

19   screenshots of the "Home" page or the "My Listings" section contained the G-SUITE mark.  Dkt.

20   No. 126-25.  On March 28, 2017, almost two months prior, Ms. Cyr (Plaintiff's COO) sent

21   colleagues the exact same screenshot of the homepage of the App that also undisputedly did not

22   contain or use the mark.  Dkt. No. 139-12.  Those identical screenshots, circulated internally

23   within GearSource by both Ms. Cyr and Ms. Bourgette, appeared as follows:

24

25
_____

26   [2] In fact, June 2018 is when the name of the App changed to G-SUITE, and when "G-SUITE"
     appeared for the first time on store pages associated with the App.  Mot. at 7; Dkt. No. 61-7 ¶ 8
27   ("Plaintiff freely acknowledges that the formal name of our app remained GearSource until 2018
     ….); Dkt. No. 126-28 (message from de Manincor to Cyr on June 4, 2018 in which de Manincor
28   asked if "we're changing the name of the app in the app stores?," and Cyr responded "yes – to G-
     Suite App").

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California



1      Plaintiff, however, characterizes other screenshots of the App that contained the G-SUITE

2   mark as "screenshots of the mobile app from May 2016," relying on Mr. Fairbairn's testimony to

3   support that date.  Opp. at 9.  The screenshot relied upon by Mr. Fairbairn is as follows:



The screenshot above is a document that was produced with the Bates number "GEA 489-

90."  Dkt. No. 128-2 ("JvB Sanctions Decl.") ¶ 7(c).  It is a PDF of two native image files that Mr.

Fairbairn initially testified reflected the App as of "May or June" 2016.  However, later-produced

metadata revealed that the images were undisputedly taken and created in 2018.  *Compare* Dkt.

No. 128-15 *with* Dkt. No. 126-31; Dkt. No. 126-32 (exact visual match); JvB Sanctions Decl. ¶¶

United States District Court
Northern District of California

1   7(c), 17 (metadata match); Dkt. No. 137 at 9 (citing Dkt. No. 137-9) (images taken in October

2   2018)).

3          Plaintiff initially produced GEA 489-90 (Dkt. No. 128-15) as a PDF without any

4   corresponding metadata, which inhibited Defendant's ability to date the screenshot.  JvB

5   Sanctions Decl. ¶ 7(c).  At his deposition, Mr. Fairbairn testified that:

6               Q. When we last spoke, we had talked about whether or not there were
                any documents that GearSource possessed that **demonstrated the use**
7               **of the GSUITE mark in connection with mobile apps in 2016,**
                **2017**, really any date able to find out?
8               A.  .  .  .  .  [F]or sure, **one document is Number [GEA]**
                **490**…Document Number 490 is actually a screenshot of the app that
9               says, 'GearSource powered by G-Suite.'
                Q. . . . . And why do you believe that . . . ?
10              A. **Well, first of all, it is the old GearSource logo.** Secondly, it is
                the -- it is GearSource powered by G-SUITE, so it's -- it's actually
11              the GearSource app powered by G-SUITE, so it's not the name
                changed yet or any of those things. And it's just a screenshot of the
12              app, **which I believe was from 2016**."

13  Dkt. No. 126-6 at 225:11-227:12 (emphasis added)

14         Mr. Fairbairn did not provide any further information to support his contention that the

15  App contained the G-SUITE mark in May 2016 beyond GEA 489-90:

16              Q. [T]his is a critical issue relating to priority . . . I need to know . . .
                where that document came from, how it was collected, and…what
17              evidence you have to support that this was a document that was
                actually used and displayed to consumers at the time . . . Would you
18              be able to provide that information to me?
                A. Today, no. I don't know the answer to that.
19              Q. . . . . So when will I be able to know whether or not this document
                actually demonstrates your use of the G-SUITE mark in connection
20              with the mobile app?
                A. It does. It is a picture of our G-SUITE mark on our mobile app.
21              Q. But **when -- when was it available** . . . .
                A. I told you that **I don't know but sometime in 2016**.
22              Q. . . . . So when . . . will you be able to confirm that?
                A. **We can't confirm that.**
23              Q. . . . . So just -- just to clarify, you can't tell me right now **when**
                **0490 was -- actually appeared to consumers in connection with**
24              **your mobile app**; is that right?
                A. **Yes. In May of 2016.**"

25  *Id.* at 228:3-231:24 (emphasis added).

26         After a substantial discovery battle that included eleven hearings before Magistrate Judge

27  Corley, Dkt. Nos. 65, 72, 75, 81, 85, 93, 99, 106, 111, 118, 122, Plaintiff eventually produced the

28

native files of GEA 489-90, which were located in Mr. Fairbairn's Google Drive folder.  The metadata undisputedly demonstrated that the screenshots relied upon by Mr. Fairbairn were created on October 1, 2018—not in 2016 as he testified.  JvB Sanctions Decl. ¶ 17 (citing JvB Sanctions Decl. Exs. 43, 44).  When confronted with this information at his deposition, Mr. Fairbairn recanted and testified that he could not recall whether GEA 489-90 reflected the App as of May 2016.  Dkt. No. 153-27 at 303:25-304:2 ("What I'm saying is I don't know if this is the document that I requested showing the mobile app in 2016.  I don't know if that's the document.").  Additionally, Mr. Fairbairn's claim that GEA 0490 must have dated to 2016 because it showed an updated GEARSOURCE logo, in which "Gear" is stacked over "Source," is undisputedly factually incorrect because Plaintiff previously identified that exact change as being first released in 2018.  JvB Sanctions Decl. Ex. 5 at 11 ("The company's main logo was updated (as the company has done on prior occasions) in a series of meetings and discussions in January 2018 …."); *id.* Ex 54 (on January 31, 2018, Plaintiff's marketing director Rebecca Jennings sent Mr. Fairbairn potential logos that she had developed in different fonts, none of them with "Gear" stacked on top of "Source"); *id*. (on the same date, Mr. Fairbairn asked Ms. Jennings "**can we have a stacked version where gear is over source?**") (emphasis added); *see also id.* Ex. 21 (finalizing new logo in February 2018).

Mr. Fairbairn also initially testified that G-SUITE appeared in the description—or promotional text—displayed with the App starting in 2016.  Dkt. No. 128-18 at 211:8-212:2.  Later-produced documents would show this also to be false.  Ms. Cyr added G-SUITE to the App's description after receiving Google's letter pointing out that Plaintiff's registration could be cancelled because Plaintiff had failed to use the mark in connection with downloadable software.  Among the documents reflecting this is the April 22, 2018 email from Ms. Cyr to Mr. de Manincor, instructing him to "update the description on the Listing App" and explaining that "[b]y making the App part of G-Suite®, we are covering ourselves completely on the Google lawsuit simply because the app is downloadable."  Dkt. No. 61-5.  As a matter of law, the mere appearance of the mark on a page, without evidence it was seen by a sufficient number of members of the consuming public, or that it appeared before Google's first use in 2016 and

1   remained in such use continuously thereafter, cannot support priority. *See Am. Auto.*, 367 F. Supp.

2   3d at 1092 (N.D. Cal. 2019) ("limited mention of [the mark] at the end of the . . . [w]ebsite does

3   not constitute sufficient use"); *Dep't. of Parks & Recreation for State of Cal. v. Bazaar Del*

4   *Mundo Inc.*, 448 F.3d 1118, 1125-26 (9th Cir. 2006) (use must begin prior to defendant's first use

5   and be continuous thereafter).

6           Further, when confronted with her March 28, 2017 email titled "App screen shots" that

7   attached screenshots of the App that clearly did not show the mark, Ms. Cyr could not recall

8   whether the screenshots accurately reflected the App as it appeared when she sent the email in

9   2017, and testified that she did not remember the date on which those screenshots were taken.

10  Dkt. No. 139-12; Dkt. No. 158-3 at 95:21-101:18 ("I just don't know when the screen shot was

11  actually taken.  I know when the email was sent, but I don't know if that's when the screen shot

12  was taken, so I can't speak to that.").  Ms. Cyr did not testify that the screenshot was taken prior to

13  June 9, 2016.

14          When Ms. Cyr attempted to support the idea that the App contained the G-SUITE mark in

15  May of 2016, she also could not provide any specific date, or even confirm that use of the mark

16  began in May instead of June of 2016.  Cyr I Depo at 23:25-24:3 ("Q: When was [the App] named

17  G-Suite?  A: In probably about May, June of 2016.").  In addition, Ms. Cyr had no recollection of

18  what the alleged changes to the App were, and stated that she believed Rebecca Jennings added

19  reference to G-SUITE in the FAQ section of the App:

20              Q: What were the changes made in 2016 to the FAQ?
                A: I can't speak to the specific changes.  I know we added the term
21              "G-Suite," and we added a reference to what G-Suite was, but other
                than that I can't tell you every change that was made.
22              Q: And who added that reference?
                A: **I believe it was Rebecca Jennings.**
23              Q: So how do you know she added it?
                A: **I don't know for sure.  I'm assuming she did.**  I believe
24              somebody proofed it.

25  Dkt. No. 155-11 at 90:3-12 (emphasis added).  When pushed as to whether she recalled reviewing

26  or proofing the alleged change to the App, Ms. Cyr testified:  "Not specifically.  I proofed a lot of

27  things for her, and she always had to have somebody proof her work.  She had – she made lots of

28  typos."  *Id.* at 90:20-23.  Ms. Cyr also testified that neither she nor Mr. Fairbairn had personal

United States District Court
Northern District of California

18

1    knowledge of the day-to-day status of G-SUITE.  Dkt. No. 158-3 at 41:14-19 ("Q: Did you have

2    personal knowledge of the day-to-day status of G Suite? A: No. Q: Did Mr. Fairbairn have

3    personal knowledge of the day-to-day status of G-Suite? A: No, he didn't.").  Similarly, Ms. Cyr

4    testified that she does not use the App, and said "I don't see it personally.  I was relying on people

5    that work for me to do what they were told to do and that what I was seeing was accurate."  *Id.* at

6    108:5-9.

7         Ms. Jennings then directly contradicted Ms. Cyr's testimony, and testified that she "never

8    was aware of [G-SUITE] going into the app."  Jennings Depo. at 49:10-13.  Remarkably (in light

9    of all this testimony), Plaintiff attempts to discredit Ms. Jennings in its opposition by asserting that

10   she "**had little or no involvement with G-Suite**."  Opp. at 3 (emphasis added).

11        Plaintiff now contends that the G-SUITE mark "could" be added via what Plaintiff calls a

12   "content manager system" without such changes showing up in the source code, even though

13   Plaintiff has no record of, or evidence, to support this ever having happened.  *See* Opp. at 5-6

14   ("What these Google witnesses failed to consider is that material could be added to the mobile

15   apps without use of source code … Other employees, including **Cyr and Carrie Bourgette** could

16   make such changes … Content changes through the content manager system do not require coding

17   on the apps.") (emphasis added) (citations omitted).  This could have occurred, according to

18   Plaintiff, on a date uncertain, seen by no one except Plaintiff's CEO and COO (who happen to be

19   related and co-owners of Plaintiff), and on a date prior to when Plaintiff (1) chose the mark "G-

20   SUITE," (2) sent around screenshots of the App without the G-SUITE mark, and (3) added the

21   mark "G-SUITE" to prove use in commerce.[3]

22        This revised "content manager system" theory is insufficient to create an issue of fact for at

23   least three additional reasons.  First, Ms. Cyr, the "project manager" who Plaintiff contends "could

24   make such changes," Opp. at 6, testified that she did not make the changes, did not use or have

25   _____

26   [3] There is also no genuine dispute that, at the time Plaintiff submitted the SOU (or at any other
     time prior to registration), Plaintiff had not displayed the mark on any downloadable or otherwise
27   transferable software that had been shipped or sold in U.S. commerce.  *See, e.g.*, Dkt. No. 126-13
     (on August 29, 2017, Ms. Cyr messaged Mr. de Manincor asking "I need you to do something for
28   me ASAP … On G-Suite - the log-in and logged in pages, we need to show the name G-Suite - I
     have to show 'specimens of use in Commerce.'").

United States District Court
Northern District of California

United States District Court
Northern District of California

1  personal knowledge of the day-to-day status of the App, and did not review any changes that

2  would have been made, as noted above.  Dkt. No. 158-3 at 41:14-19; Dkt. No. 155-11 at 89:24-

3  91:1.  Second, the only other employee that Plaintiff mentions who could have made the change is

4  Carrie Bourgette, Opp. at 6.  But Plaintiff has provided absolutely no evidence to support this, and

5  admits as much in its opposition by stating that "[n]o evidence is offered from Carrie Bourgette,

6  the GearSource employee, who allegedly created the exhibit to say what the screen shots are or

7  when these screen shots were taken."  Opp. at 7.  Lastly, the expert testimony cited by Plaintiff to

8  support this theory only shows that the experts did not know whether material in the App would or

9  would not show up in its source code, and also that they did not know "whether that content was

10  generated by hard-coding it into the GearSource App software itself, or whether it resided on a

11  website external to the app that the app then called and incorporated on May 20, 2019."  Dkt Nos.

12  155-6 at 73:2-22; 153-52 ¶ 18.

13        In fact, in a June 1, 2018 email exchange between Ms. Cyr and Mr. de Manincor, Ms. Cyr

14  asked "how hard is it to **change the logos on the app**" and said "I think we need to – it supports

15  the lawsuit situation and that could be big," and Mr. de Manincor explicitly responded that "**the**

16  **apps themselves can't be rebuilt without being updated**."  Dkt. No. 126-12 (emphasis added).

17  In any event, Plaintiff puts forward no evidence from either the source code or an external

18  platform—other than the conclusory statements of counsel—that shows that the App contained the

19  G-SUITE mark via the content manager system prior to June 9, 2016.

20        There is a body of Ninth Circuit case law cited by Defendant suggesting that

21  uncorroborated and self-serving testimony can be insufficient to create a genuine issue of material

22  fact on summary judgment.  *See, e.g.*, *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958,

23  967 (9th Cir. 2011); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)

24  (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)).  The issue with relying

25  upon that legal theory—alone—is that almost all testimony is self-serving.  *See, e.g.*, *Manley v.*

26  *Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).  Therefore, even "uncorroborated and self-serving"

27  testimony can be sufficient to establish a genuine dispute of fact where it is "based on personal

28  knowledge, legally relevant, and **internally consistent**."  *See Nigro v. Sears, Roebuck & Co.*, 784

1    F.3d 495, 498 (9th Cir. 2015) (emphasis added).

2          Here, while there is no question that the testimony of Plaintiff's CEO and COO is self-

3    serving and uncorroborated, the Court is satisfied that the totality of the record established by the

4    undisputed facts fails to show any *genuine* issue of material fact in this dispute.  When coupled

5    with Plaintiff's numerous and inconsistent revised theories and recantations throughout the case,

6    the undisputed facts discussed in detail above establish that nothing in this record precludes

7    summary judgment.[4]  Accordingly, the Court **GRANTS** summary judgment in favor of Defendant

8    Google as to the trademark infringement claim.[5]

9          **B.    False Advertising Claim**

10         To prevail on a false advertising claim under the Lanham Act, Plaintiff must establish,

11   among other things, that Google made a false statement of fact about its own or another's product.

12   *Apple Inc. v. Amazon.com Inc.*, 915 F. Supp. 2d 1084, 1087 (N.D. Cal. 2013).  The false statement

13   must concern the nature, characteristics, or qualities of a defendant's or plaintiff's goods or

14   services.  *Id*. at 1090.  The "mere use of" an allegedly infringing trademark "cannot be construed

15   as a representation that the nature, characteristics, or quality of [defendant's product] is the same

16   as that of [plaintiff's product]."  *Id*.  Thus, a "false advertising claim fails" where it is merely

17   "duplicative of [an] infringement claim."  *Lasoff v. Amazon.com, Inc.*, 741 F. App'x 400, 402 (9th

18   Cir. 2018);[6] *see also Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1182

19   (N.D. Cal. 2007).

20         The allegations supporting Plaintiff's claim are the same as those underlying its trademark

21

22   _____

23   [4] Because the Court finds that the App does not establish common law priority rights so as to
     afford Plaintiff a protectible ownership interest in its mark, the Court need not consider whether
     there is a likelihood of confusion between the marks.  *See Rearden*, 683 F.3d at 1202-03.

24   [5] Of Plaintiff's claims, only its Lanham Act claims permit recovery of damages or profits.  *Marble
     Bridge Funding Grp., Inc. v. Euler Hermes Am. Credit Indem. Co.*, 225 F. Supp. 3d 1034, 1045

25   (N.D. Cal. 2016) (the only monetary remedy under the UCL is restitution).  "The Ninth Circuit has
     recognized that claims for damages under the Lanham Act may be properly disposed of on

26   summary judgment" and its "courts routinely grant[] summary judgment against plaintiff's request
     for disgorgement" of profits.  *Am. Auto.*, 367 F. Supp. 3d at 1102, 1105.  Because the Court will

27   enter summary judgment in favor of Defendant, Plaintiff is not entitled to damages or Google's
     profits, and the Court need not address whether Plaintiff has met its burden on damages.

28   [6] As an unpublished Ninth Circuit decision, *Lasoff* is not precedent, but may be considered for its
     persuasive value.  *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

United States District Court
Northern District of California

infringement claims.  Compl. ¶¶ 13-14, 17-21, 23.  There are no "false statements" at issue apart from Google's allegedly infringing use of its G SUITE mark.  As "mere use" of a mark is insufficient to establish a false statement, Plaintiff's claim fails as a matter of law.  *Apple*, 915 F. Supp. 2d at 1090.  Accordingly the Court **GRANTS** summary judgment in favor of Defendant Google on the false advertising claim.

### C.    Unjust Enrichment Claim

"[I]n California, there is not a standalone cause of action for unjust enrichment, which is synonymous with restitution."  *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quotation omitted).  "When a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'"  *Id.* (quotation omitted).  Such a "claim" requires that the defendant obtained a benefit from the plaintiff, and it would be unjust not to return it.  *Id.*  An unjust enrichment claim that restates a trademark infringement claim, without alleging any quasi-contractual relationship, fails as a matter of law.  *See, e.g., Sugarfina, Inc. v. Sweet Pete's LLC*, No. 17-cv-4456-RSWL-JEM, 2017 WL 4271133, at *6 (C.D. Cal. 2017) (granting motion to dismiss).

Here, the facts supporting Plaintiff's claim are the same as those supporting its trademark infringement claim (and false advertising claim), Compl. ¶¶ 42-44, and do not involve any benefit to Google, unjustly retained or otherwise, from Plaintiff.  Therefore, the Court **GRANTS** summary judgment in favor of Defendant Google on the unjust enrichment claim.

### D.    Google's Counterclaim for Cancellation of Registration

Google counterclaims for cancellation of Plaintiff's registration of the G-SUITE mark.  Dkt. No. 26.  In light of the above ruling on the Motion for Summary Judgment, Google is **DIRECTED** to file a statement of no more than 5 pages within fourteen (14) days from the date of the entry of this Order indicating whether Google's counterclaim is moot and/or whether Google plans to move forward with its counterclaim.  If Google intends to move forward with its counterclaim, the Court will address the counterclaim in a separate order.

## IV.    MOTION FOR SANCTIONS

Defendant requests terminating, preclusion, and monetary sanctions, contending that

"Plaintiff repeatedly lied about its discovery efforts, gave false testimony about its use of its G-SUITE mark, and spoliated evidence." Mot. for Sanctions at 1. As a preliminary matter, the Court **DENIES** Defendant's request for terminating and preclusion sanctions as moot in light of the above ruling granting summary judgment in its favor. Regarding Defendant's request for monetary sanctions, although the Court has significant concerns about Plaintiff's discovery conduct, Defendant's entitlement to monetary sanctions will depend on the details of precisely what occurred in the discovery proceedings, and on the fees and costs reasonably spent litigating those issues. As noted above, Magistrate Judge Corley spent a significant amount of time presiding over the relevant discovery disputes here. Accordingly, in light of Judge Corley's extensive familiarity with the issues presented by Defendant's Motion for Sanctions, pursuant to Civil Local Rule 72-1 the Court **REFERS** the remainder of that motion to Judge Corley for resolution. Counsel will be advised of the date, time and place of any appearance by notice from Magistrate Judge Corley.

## V.     MOTION TO SEAL

Google has filed two administrative motions to file under seal portions of its briefs and various other filings in this case. *See* Dkt. Nos. 126, 156. Google seeks to seal Exhibits 11, 12, 19-59, 61 and portions of Exhibit 16 to the Declaration of Jane van Benten offered in support of the Motion for Sanctions, and portions of the Motion for Sanctions reflecting such information. Google also seeks to seal portions of Exhibit I to the Declaration of Kirk Freeman (Dkt. No. 155-10, "Buss Report") offered in support of Plaintiff's Opposition to Google's Motion for Summary Judgment ("Opposition"), and a portion of one sentence in the Opposition which repeats portions of the Buss Report.

### A.     Motion for Sanctions Documents

According to Google, Exhibits 11, 12, 19-59, 61 and portions of Exhibit 16 were designated by Plaintiff as either CONFIDENTIAL or HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY under the terms of the Protective Order. Dkt. No. 126 at 2 (citing Dkt. No. 43). Google takes no position as to whether the contents of these documents contain confidential information, and Google provisionally filed these documents, and corresponding

United States District Court
Northern District of California

references in the Motion for Sanctions, under seal so that Plaintiff had an opportunity to file a declaration to maintain such documents under seal. *Id.* at 3. Plaintiff has not responded to the motion to seal in connection with the Motion for Sanctions. The parties provide limited explanation as to why this information needs to be redacted in this case, pointing only to their CONFIDENTIAL or HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY designation. This is insufficient to meet the compelling reasons standard. The Court therefore **DENIES** the request to seal in connection with the Motion for Sanctions.

### B. Motion for Summary Judgment Documents

The Buss Report includes six schedules ("Schedules") that detail Google's internal and confidential financial and business data associated with Google's Cloud Apps business line, which includes Google's G SUITE offering. Dkt. No. 156-2 ("Marri Decl.") ¶ 4. Schedules 1, 2, 3a, and 3b reveal Google's revenue associated with specific products and services in the Cloud Apps business line, categories of costs and expenses, and profits in financial quarters between 2014 and 2018. *Id.* ¶ 5. Schedules 2 and 4 reveal the exact number of paid user accounts for G Suite ("paid seats") in financial quarters between 2014 and 2018. *Id.* ¶ 6. The Buss Report also includes additional calculations derived from Google's data, which are a direct reflection of Google's confidential financial and business information (e.g., Schedule 1 includes Mr. Buss's calculation of "gross profit as a percentage of revenue"). *Id.* ¶ 7. The body of the Buss Report repeats much of the confidential information included in the Schedules. *Id.* ¶ 8.

The Opposition quotes confidential information from the Buss Report on page 26 at line 16. *Id.* ¶ 9. Google's specific revenue, profit, expenses, and costs associated with the products and services included in the Cloud Apps business line, and number of G SUITE paid seats, constitute non-public information. *Id.* ¶ 10. Google maintains this information in a restricted database and access to such information is limited to select employees. *Id.* ¶ 12.

Courts generally apply a "compelling reasons" standard when considering motions to seal documents related to a dispositive motion. *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (quoting *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)). "[A] strong presumption in favor of access is the starting point." *Kamakana*, 447 F.3d at 1178

24

1   (quotations omitted).  To overcome this strong presumption, the party seeking to seal a judicial

2   record attached to a dispositive motion must "articulate compelling reasons supported by specific

3   factual findings that outweigh the general history of access and the public policies favoring

4   disclosure, such as the public interest in understanding the judicial process" and "significant

5   public events."  *Id.* at 1178–79 (quotations omitted).  Protecting a trade secret is one such

6   "compelling reason."  *In re Elec. Arts, Inc.*, 298 F. App'x 568, 569 (9th Cir. 2008).

7        Examples of trade secrets include "pricing, profit, and customer usage information kept

8   confidential by a company that could be used to the company's competitive disadvantage."

9   *Johnson v. Serenity Transp., Inc.*, No. 15-cv-02004-JSC, 2017 WL 1365112, at *24 (N.D. Cal.

10   2017).  Further, calculations "derived from" a party's sealable confidential information also

11   warrant protection.  *Asetek Danmark A/S v. CMI USA, Inc.*, No. 13-cv-00457-JST, 2015 WL

12   12964641, at *2 (N.D. Cal. 2015) (holding compelling reasons existed to seal calculations

13   "derived from sales data on [party's] infringing products").  The sealable information in the

14   Schedules includes revenue, sales, expenses, and profit margins associated with specific products

15   and services offered by Google.

16        Civil Local Rule 79-5 supplements the compelling reasons standard set forth in *Kamakana*:

17   the party seeking to file a document or portions of it under seal must "establish[] that the

18   document, or portions thereof, are privileged, protectable as a trade secret or otherwise entitled to

19   protection under the law . . . The request must be narrowly tailored to seek sealing only of sealable

20   material."  Civil L.R. 79-5(b).  Google has narrowly tailored its proposed redactions to protect

21   only the information that is sealable.  *Id.*  The proposed redactions applied to Schedules 1-4 seal

22   Google's detailed revenue, expense, profit, and sales information associated with specific products

23   in its Cloud Apps business line, and calculations Mr. Buss makes based on these numbers.  The

24   proposed redaction applied to Schedule 5 seals Mr. Buss's calculations concerning expenses

25   associated with the Cloud Apps business line.  The proposed redactions to the body of the Buss

26   Report seal the same information redacted in the Schedules.  The proposed redaction to the

27   Opposition seals only the profit and revenue information calculated in the Buss Report.

28   Therefore, the Court **GRANTS** the Motion to Seal in connection with the Motion for Summary

1   Judgment.

2   **VI.        CONCLUSION**

3           For the reasons discussed above, the Court **GRANTS** Defendant's motion for summary

4   judgment, **DENIES IN PART AND REFERS IN PART** the Motion for Sanctions, and

5   **GRANTS IN PART** and **DENIES IN PART** the Motions to Seal.

6           **IT IS SO ORDERED.**

7   Dated:   7/8/2020

8                                                    HAYWOOD S. GILLIAM, JR.
9                                                    United States District Judge